## THE MORRIS AND ESSEX RAILROAD COMPANY v. THE CENTRAL RAILROAD COMPANY OF NEW JERSEY.

1. The Central Railroad Company was chartered 26th February, 1847, and has for many years owned and used a road between Elizabethport and Phillipsburgh. Their charter authorized them to construct "a railroad or lateral roads" with a branch road between certain termini, and gave power to build and maintain, at the Delaware river or within thirteen miles of the borough of Easton, such wharves, piers, bridges, and other facilities, as they might think expedient and necessary for the full enjoyment of all the benefits conferred by the charter.

2. In May, 1860, the Morris and Essex Railroad Company (the plaintiffs) filed the survey of a route for the extension of their road from Hackettstown to the Delaware, at Phillipsburgh, and in 1863 purchased lands in Phillipsburgh, on the line of said route, upon which they constructed the road-bed of their said road, as early as 1st April, 1864.

3. On 24th March, 1864, the defendants filed a survey or location of a part of their road in the village of Phillipsburgh, the route of which survey crossed the location of the extension above mentioned, thus giving to the defendants a new access to the Delaware river. They afterwards applied to have damages appraised for the lands so to be taken. An award having been made, the proceedings were removed to this court by *certiorari*. *Held* by the court—

1. That the defendants' road having been long completed and in use, and the branch now proposed to be made, having formed no part of the original plan in making the road, they had no right to add such branch, under any provision of the charter.

2. That the charter gave to the defendants no authority to add a branch or spur to their road. Having laid out the road according to the charter as they understood it, their powers were exhausted.

3. That the term limited for taking land under the charter had expired, and the right of eminent domain conferred, no longer existed.

4. By the 7th section of the defendants' charter, it is provided that it shall be lawful for the company to change or alter the location of said road or to locate new lines, when additional tracks shall be required at any point or points between Phillipsburgh and Elizabethport, not

varying in any case over one mile from the line located and filed. The court *held*—

1. That as the company had not, since the passage of the act, established any new lines, its power in that respect was not exhausted.

2. That by the terms "between Phillipsburgh and Easton," as used in the charter, those two places, being the termini of the road, are not excluded.

3. To authorize the Central Railroad Company to cross the track of the Morris and Essex road, it is not necessary that any express power should be given in the charter.

On *certiorari*, to set aside award of commissioners.

This case was argued on a statement of facts agreed on by counsel, and which appears in the opinion of the court.

For plaintiffs in *certiorari*, *C. Parker* and *A. O. Zabriskie.*

For defendants, *Attorney-General* and *B. Williamson.*

The opinion of the court was delivered by

BEASLEY, C. J.   The questions for consideration in this case arise out of the following facts, which have been agreed upon by the parties: the Central Railroad Company of New Jersey have for many years, and prior to the location of the Morris and Essex railroad at Phillipsburgh, owned a railroad beginning at Elizabethport and extending to the Delaware river, at Phillipsburgh.  On the 29th May, 1860, the Morris and Essex Railroad Company filed a survey in the office of the secretary of state of New Jersey, under their charter and its supplements, of a route for the extension of their railroad from Hackettstown to the Delaware river, and in December, 1863, they purchased certain lands in Phillipsburgh on the line of said route and adjoining land of the Central Railroad Company, upon which, as early as the first of April, 1864, they constructed the road-bed of their said railroad.  Afterwards, on the 24th of March, 1864, the Central railroad of New Jersey filed in the office of the secretary of state a survey or location of a part of the Central railroad in the village of Phillipsburgh, the route of which

survey crossed the before-mentioned location of the extension of the Morris and Essex railroad. Subsequently the Central Railroad Company presented a petition to one of the Justices of the Supreme Court, for the appointment of commissioners to examine and appraise the lands so by them intended to be taken from the Morris and Essex railroad, and to assess the damages sustained by the latter company by taking said lands. The commissioners having made their award, the proceedings were removed into this court by *certiorari*.

It will be perceived that the principal matter in controversy is this: the Morris and Essex Railroad Company laid out in an admittedly legal manner, a route for the extension of their road. The Central railroad now claim the right to cross the route thus laid out, with a branch to their road at Phillipsburgh to afford them a new access to the Delaware river.

The claim thus made by the Central railroad is resisted on these grounds:

*First.* Because they have no legal authority to make the branch road in question.

The solution of this point depends altogether, on the proper construction of the charter of the Central Railroad Company and its supplements.

It is claimed, in the first place, by the counsel of this company, that the power to make the road in dispute is conferred by the original act of incorporation.

This charter is in the usual form. Section sixth authorizes the corporation to construct " a railroad or lateral roads," together with a certain branch road, between certain termini; and the thirteenth section declares that the company shall also have the privilege and authority " to erect, build, and maintain, at the Delaware river or within thirteen miles of the borough of Easton, such wharves, piers, bridges, and other facilities as they may think expedient and necessary for the full enjoyment of all the benefits conferred by this act." There is also a provision in the seventeenth section to the effect, that the act should be void unless the road should be completed and in use within a prescribed period.

This charter was passed on the 26th February, 1847. It is admitted that the road was long ago completed and has ever since been in use. The branch road now projected, it is not pretended was any part of the original plan in making the road, but on the contrary its necessity has arisen from exigencies produced by the developments of its business, which were not then anticipated.

The principle of law applicable to such a condition of affairs appears to me to be entirely indisputable. And if the question was one absolutely unaffected by authority, and had to be settled solely by the ordinary criteria of statutory construction, I must think it clear that the only result which could be reached, would be the rejection of this claim of this company, to add a branch or spur to their road by force of any of the provisions of their charter. To sanction such a claim would be to decide that this company may, as occasion presses, for all time to come practice similar encroachments. Such a view would be equivalent to holding, that all the land along the line of the road is subject to the seizure of the corporation, whenever such land becomes convenient for its purposes; and that this great power of eminent domain, is forever to remain in abeyance in the hands of the company, to be exercised at its will. And it is also to be remembered, that if the Central Railroad Company has been the recipient of this formidable grant of power, so has, in all probability, every railroad now in existence in this state.

I can find nothing either in the language of this statute or in the object the legislature had in view, or in the general maxims of jurisprudence, which will justify the construction which is claimed. The language of the act, in all its parts, is plain and intelligible. It authorizes the making of a road or roads and one branch road, and the acquisition and construction of certain convenient adjuncts. This is the entire scope. The company may do, at their option, one or more things; they do the act or acts and thus signify their election; and that is final. Any other conclusion would leave the scheme authorized by the legislature forever unsettled and undetermined. Every private right in the vicinity of the

road would be subordinated to it. There is not a word in the act which seems to intimate the transmission of the right to alter the road, when once laid, or to add to or extend it; and it is scarcely necessary to say that such a prerogative cannot be the creature of intendment. The claim of a power so much in derogation of common right and public interests, could only be sustained by the most manifest intention on the part of the legislature to confer it. But there is nothing in the language of this act which, fairly dealt with, tends in that direction.

Nor can it be justly said that this power of alteration or addition, was at all necessary for the accomplishment of the purpose within the view of the framers of the law. As a general thing it is not difficult for a company, in the exercise of ordinary sagacity, to foresee and provide for the increase of its business. Practically, there has been no difficulty on this head : or if the power originally obtained has proved to be insufficient, the remedy has been an application to the legislative authority for relief.

Neither will the ordinary rules of law sustain the defendants' assumption. If A grant to B a right of way over his farm, such way to be laid out by B, it could not be plausibly pretended that after such way had once been located and ascertained by B, it could afterwards be relocated, or altered or added to by him. It was the very sensible rule of the common law "that if a man once determines his election it shall be determined forever." *Com. Dig., tit. Election, C.* 2. This maxim has been deemed peculiarly applicable to acts done under the authority of the state, and it has been held, repeatedly, that the powers given to a corporation to take lands, when once exercised are exhausted. Thus the right of a railroad company, after their road was actually located, to make a relocation or to abandon the route adopted by them for a more eligible one, was entirely repudiated in the case of *Moorhead* v. *The Little Miami R. Co.,* 17 *Ohio,* 340. And the same principle was applied in the case of *Blakemore* v. *The Glamorganshire Canal Co.,* 1 *My. & Keene* 154. This

company was empowered to construct a canal, the dimensions of which were not fixed by the act authorizing the enterprise, nor the amount of water which might be appropriated by the company. After the completion of the canal the company determined on its enlargement; this was resisted, and Lord Eldon, in denying the right of the company to make the projected alteration, asserted, with emphasis, the general rule above stated. His language was— "But if that is done and the canal is completed in the sense which the act of parliament means by the word *completed*, and the sense put upon the word by these defendants themselves, (as is shown by their going about to levy their tolls on the whole course of the canal) and if, notwithstanding, they may afterwards widen and deepen the canal, what is there to hinder them from carrying it from sea to sea? Why, there would be no end to it. When the canal is completed the powers of the company are exhausted, and in making the canal, the proprietors are not at liberty afterwards to injure the interest of parties by making what is quite a different canal."

I think the defendants, by laying out their road, with its appendages, to their own satisfaction, in the sense in which they understood their charter, entirely exhausted all the powers conferred on them to take land under their charter.

But there is also another ground on which, as it seems to me, this claim of the defendants ought to be rejected. It has become the settled rule, adopted in many decisions of great weight, that the power of a corporation to take the land of an individual, is determined by the expiration of the term limited for its exercise. In the case before us the time limited has long since run out, and on this account also, the right of eminent domain derived from the charter, no longer exists in the hands of the company. *Regina* v. *The London and North Western R. Co.*, 6 *E. L. & Eq.* 220; *vide* cases collected in 1 *Am. R. Cases* 150.

Failing in their first position, the defendants next take their stand on the supplement to their charter, passed on the 17th March, 1854. *Pamp. Laws, p.* 526. The seventh sec-

tion of this act is the one relied on.   Its language is—" That it shall be lawful for the said company to change or alter the location of their said railroad, or to locate new lines when additional tracks shall be required, at any point or points between Phillipsburgh and Elizabethport, not varying in any case over one mile from the line as located and filed."

It is not shown that the company have, since the passage of this supplement, established any new line; no question, therefore, arises in this connection, with regard to the exhaustion of their power from its exercise.   As an additional track seems required by the Central Railroad Company for the convenient transaction of their business, why may they not then, by virtue of the supplementary act, locate the road now projected?

The answer of the counsel of the plaintiffs to this inquiry on the argument, was, in the main, that the clause of the act just referred to confines the right to establish new lines, to a section of the road intermediate two fixed points, and that the line in controversy is being laid beyond the limits of such section.   It is said the power in express terms is given " to locate new lines when additional tracks shall be required at any point or points between Phillipsburgh and Elizabethport," and it is insisted that this ·phraseology excludes both the villages which are named.

It is urged that the expression " between two places," is, by its natural import, exclusive of both.   As the new line is to be laid in Phillipsburgh, the question is vital.

Is this, then, the ·fair construction of the act?   The argument in its favor was rested solely on the strict literal meaning of the words employed.   No attempt was made to sustain the construction, from any alleged fitness or utility of this particular law, which would result from this rendering of the act.   There is a strong improbability growing out of the circumstances of the case, against the inference that it was the intent of the legislature to prohibit the erection of new lines in either Phillipsburgh or Elizabethport.   It was obvious that additional tracks and new lines, were more likely to be

required near the termini of the road.   Wherefore then were these vallages, of all others, excepted?   The only reply that was, or which perhaps can be given, is, that the word "between," in the structure of the clause in question, is exceptive of both these places.

But it seems to me that this rigidly verbal interpretation of the clause will not serve the purpose, for it will fall short of the evident and undeniable object of the law makers.   It will be observed by an examination of this seventh section, that the power to alter the location of the old road and the power to locate new lines, are conferred in the same terms and are subject to precisely the same restrictions.   Hence it follows, that if a new line cannot be established within the bounds of Elizabethport or Phillipsburgh, neither can any change of the present location of the road he made in either of such places.   If this be so, then this result follows: suppose the company had changed, as they had the undoubted right to do, the location of their road as it approaches either of the places designated, say to the distance of half a mile; now according to the construction contended for, when such altered route had attained the confines of either Elizabethport or Phillipsburgh, it would have been obliged there to stop; the term "between" would have barred the way, and it could have gone no further.   It is certain that the right to change the location of the road, which is given in express terms in the act, does not practically exist to its full extent, if the two villages in question are to constitute no part of the line subject to alteration.   I think the power to vary the location of the entire line of the road "between" Phillipsburgh and Elizabethport, by necessary intendment, carries with it the right to make a corresponding variation in both the places designated.   This seems to me to be the fair construction of the act by its spirit, for by such construction alone will the privileges, which are undoubtedly conferred, be secured. Far too much stress, as I think, has been laid upon the word "between."   In common use it does not always exclude the places to which it relates.   A grant of power to construct

a railroad "between" Princeton and Trenton, would very clearly include the right of carrying such road into each place. In the clause in question, the intention being, as I deem, to comprehend the entire road, the villages in which the termini are situated are used as descriptive of the termini themselves. If one should speak of the Central railroad lying "between" Phillipsburgh and Elizabethport, such language, to my mind, would import the whole of the road from the water of the bay to that of the Delaware, and in such connection, the names Phillipsburgh and Elizabethport would be used as synonymous with termini. And this construction is certainly much fortified, by the palpable unreasonableness of the opposite conclusion, which imputes to the legislature the design of granting the power to increase indefinitely, the capacities of the interior line of the road, and at the same time condemning the extremities to the narrowness and incapacity of their original condition.

I do not regard the clause in this light, and my conclusion is that the Central Railroad Company, by force of this supplement, has the right to erect new lines of road in either or both of the villages above named.

The second ground of objection to the proceedings under consideration was, that as the land in question had first been taken under a statute of this state for the purpose of a public railroad, it was not lawful to cross it and take it for the purposes of the Central railroad, without express authority given by the legislature for such crossing. It will be observed that this objection does not attempt to call in question the power of the legislature, to authorize the crossing of the road-bed of the plaintiffs by the track of another railroad. Such a restriction on the legislative authority is not, and could not be pretended. But the argument is, that the power to cross must be given in express terms.

The right which it claimed is merely the privilege to cross the land and track of the plaintiffs. It is not proposed to make any use of their railroad, as such. Their franchises, therefore, are not interfered with.

Under these circumstances, I am wholly at a loss to perceive the force of the present objection. If the legislative grant of the power in question, is sufficient to enable the defendants to run their new lines over the lands of individuals, why has it not an equal efficacy with regard to the land of the plaintiffs? Does an incorporated company stand, in this respect, on a higher level than the ordinary land owner? I am not aware that such a prerogative has ever been claimed. If claimed, it ought not to be conceded. It may well be, that where the attempt is to sequestrate a portion of the franchises of a railroad company, to the use of a company subsequently incorporated, such sequestration could not be justified, in the absence of a grant of such authority in clear and express terms. Such a right could scarcely be raised by implication. It certainly could not be legitimately inferred from a mere authority to acquire by condemnation, the land requisite for the enterprise. But when the franchises are untouched, and the claim is simply to a right of way across the track of a railroad company, such company, in my opinion, occupies no higher ground than the common land owner. An opposite view would be attended with much mischief. Neither city streets nor public roads could be laid over canals or railroads, under the general laws of the state. It would seem also to place almost all the railroads in the state in the attitude of wrong-doers, for few, if any of them, have the right, in express terms, to intersect with their tracks, either public highways or the roads of incorporated turnpike companies. Nor is there in the nature of the act in question, anything which would appear to raise any presumption, that the power to make such intersection was not intended to be granted. The inconvenience to the company, from the intersection of their road by the track of another company, and by the use of such track, may be greater than that occasioned the individual, by the intersection of his farm or private road—but it is an injury of the same general character, the damages in both cases being equally ascertainable. As to the suggestion that the crossing of the track of one railroad by the trains of another will be attended with much danger, it is

sufficient to say that it is a danger that can be avoided, by the exercise of the proper care on the part of both companies. I can see nothing in this suggestion, nor in any other circumstance, from which a restriction on the power of the defendants is to be implied in favor of the plaintiffs. The power to lay out new lines of road within certain specified bounds, is given in the charter of the defendants in general and unqualified terms; and as such use of the track of the plaintiffs in the manner contemplated will not, to any material extent, interfere with the operations of their road, or impair rights and franchises previously granted to them, it is not perceived how any implication can arise which will prohibit such appropriation of their track.

In the case of *The Boston Water Power Co.* v. *Boston & Worcester Railroad Corporation,* 23 *Pick.* 360, the right of a company to cross with their railroad, by virtue of a general grant of power in their charter, the lands of a company previously incorporated, although thereby the lands crossed and works thereon erected were injuriously affected, was fully sustained. The principles adopted by the court are entirely applicable to this case; and these principles are sustained by Chief Justice Shaw, in an argument distinguished alike for its great practical wisdom and for the vigor of its logic.

I conclude, then, that the defendants had the right to lay the line in controversy over the track of the plaintiffs.

The last exception taken rested in a mere matter of form, *viz.,* that the survey and route filed in the office of the secretary of state are indefinite, uncertain, and void.

This is a question of fact to be decided on the evidence. Two witnesses were examined, each of them an engineer. The engineer who made the survey and actually located the road, testified that there was nothing practically uncertain in the description of the route as filed. The other engineer was of a different opinion. Upon an examination of the papers and a consideration of the evidence, I have come to the conclusion that this ground, also for setting aside the proceedings, is not well taken.

Award affirmed.

CITED in *Childs et al.* v. *Central Railroad Co.,* 4 *Vroom* 327; *State* v. *Easton & Amboy R. R. Co.,* 7 *Vroom* 187; *State* v. *Hudson Tunnel R. R. Co.,* 9 *Vroom* 555.